The next case on the calendar is Wilson v. Hanrahan. Good morning, Your Honor. My name is Special Hagan, and I'm here on behalf of Appellant Sean Wilson in the matter of Wilson v. The City of New York. I mean, Mr. Hanrahan. So may it please the Court. Appellant makes a number of arguments in support of his appeal. I'm primarily focusing on the district court's erroneous decision regarding his hostile work environment claim on summary judgment. It's Appellant's position that the district court made a number of errors in basically dismissing the hostile work environment claim, specifically starting with whether or not it adhered to Federal Rule 56C of weighing the evidence or considering the evidence in the light most favorable to Appellant. For example, the district court determined that the investigation that the post that Mr. Hanrahan listed throughout the school in January 25th of 2011 saying that racial slurs were, you know, I guess against the policy of his staff or of his unit, it should be prohibited. There were conflicting evidence as far as whether or not that actually occurred. Mr. Hanrahan stated that he actually made this post, and then you had at least two affidavits from Mr. Miano and Mr. Newman and even Appellant himself saying that it did not happen. In this instance, the court credited Mr. Hanrahan's account, and Appellant argues that basically that was contrary to 56C. In another instance, the court decided to look at the various instances of. I'm sorry, just making sure I'm understanding what you were referring to earlier correctly. You're referring to the evidence that Mr. Hanrahan sent out an email instructing employees not to engage in conduct, and your counter to that is that there was also evidence that your client said that email wasn't received, and there were other employees, at least one other employee, who said he never received it. Well, actually, it was a memo that Mr. Hanrahan generated. They're custodial cleaners, so they don't really have access to email. So what he alleged. Thanks. I made an assumption. I shouldn't do that. No worries. What they did was they Mr. Hanrahan alleges that he posted this memo saying that the language that my client found on his logbook, which is offensive to the court, but for purposes of context, I feel compelled to say, basically, that fuck you nigger was scrawled on his logbook, that that was not permissible. And appellant and two of his coworkers provided affidavits saying that they never received this memo. And then you have Mr. Hanrahan providing a self-serving affidavit saying that he did. And the trial court found that Mr. Hanrahan actually had distributed this memo and that that was an effective remedial measure. We tend to disagree on that, on whether or not it was effective and whether or not it actually even occurred. We also argue that the district court erred in not considering any of the evidence prior to plaintiff's termination in June of the adverse employment actions. For example, plaintiff had been or appellant had been terminated at least two other times, once in April, once in June. The district court cited a stipulation of settlement agreement at the culmination of a grievance hearing in December. Our argument is that even though he couldn't, he wouldn't be able to necessarily recover from that, that at least context matters and that at least it would show evidence of intent. It would also show that there was a pervasive hostile work environment, including the incident where my client had been poisoned by his coworkers. The district court said that because of the settlement agreement that that wasn't permissible in terms of bringing that to the attention of the jury. It's appellant's position that this was an unfair and erroneous ruling in terms of that particular aspect of his case. But this is the incident with the sink. Yes. So the difficulty with your position is, as you know, the standard for a hostile work environment in the 1983 context is particularly demanding. So you have to show that the defendant's actions were a but-for cause of the hostile work environment. Some of the evidence you pointed to, certainly not all, but some, I had some difficulty finding evidence that the defendant was aware of the actions of other employees because some were not, it was not evidence that was directly reported to him by anyone. Could you address that? There were conflicting testimonies as to whether or not my client actually notified Mr. Appellant's position that he perjured himself as far as his knowledge. There's an incident where there's a question of whether or not he was told by two coworkers that there was a physical altercation between my client and two of his coworkers. During the course of his deposition, he testified, for example, Mr. Hammerhand, that he was told by the two employees, and during the course of the trial, he said that he saw the incident on videotape. So then there were other incidents where there were questions as to whether or not Mr. Hammerhand was put on notice based on an incident report. For example, with the slop sink poisoning, my client was hospitalized. There was testimony that he claimed that he, that some of the coworkers had seen him being taken out in the ambulance. My client also testified to actually having told Hammerhand about various incidents, and whether or not, you know, you credit the side of the, of Mr. Hammerhand versus my client is also a question of fact for a jury to determine. And we found, we believe that the district court erred in that regard in finding for or dismissing that aspect of the case. Could you address the Batson claim? As I understand the record, and correct me if I'm misunderstanding it, that wasn't raised before the district court until after the jury had returned its verdict, and your adversary argues that that's, that is a basis for us not to consider it here. Well, there seems to be some, I guess, confusion to some degree as far as whether or not there's waiver in this instance. It's Appellant's position that when she, when he raised the Batson challenge with the magistrate and the jury selection process, that that constituted a valid objection. And even the language that the magistrate used during the course of that discussion, where she, where she, there was a question of whether or not she abdicated her responsibility in making a determination as to whether or not the preemptory strikes were racially motivated. We, it's Appellant's position that the city articulated its view pretty clearly, that it was based on one of the jurors, I guess, I guess predisposition of watching NCIS law and order, and the other, and having, I guess, a relative that worked for the Innocence Project, and another, I guess, having a relative that was a cleaner. Not a cleaner, but just one who worked for the Innocence Project and a relative. But in United States v. Thomas, we suggested that if you failed to raise a complaint about the magistrate judge's failure to recognize the error, if you failed to raise it in the district court before the jury was sworn, we might view it as waiver. And so the question is, why shouldn't we? I mean, the caution went out there, and the whole point of raising it in the district court is that if the argument is meritorious, the jury won't be sworn until the error is corrected, and you didn't do that here. Well, there seemed to be, also in Thomas, there seemed, the law seemed to be unsettled. Although it's customary that the attorney, which would have been me in this instance, would have raised it both with the magistrate and with the district court judge, it's still unsettled as to whether or not you would have to do it twice. So Thomas suggests that you do. Well, you didn't hold it in that case, but it cautioned lawyers going forward. Is there something that you, is there something you read differently about Thomas? Well, I mean, I also looked at the Galarza case, and it did not require that the attorney raise it multiple times, the fact that they raised it at least once. And then on top of that, we didn't receive an instruction from the district judge telling us or warning us that, you know, if we don't raise this issue, that it would, if we don't raise issues about the jury, that it would constitute waiver. There was no clear instruction from the district court once the jury was impaneled or before the jury was impaneled that any objections that are not raised, that they would be waived. We never received that at all. It was just the jury was sworn in. Why do you think the appropriate time to raise it is after an adverse verdict has been returned against your client? I wouldn't necessarily say it was the most appropriate time, Your Honor. I felt that it was adequate that we raise it on the record. That the magistrate addressed the issue on the record. That she expressed concern about the use of the preemptory challenge and even mentioned that it could possibly be a point of appeal should the case be in controversy at some later point. At that point, I would say that even though it probably wasn't best practice to raise it again, again, we were not cautioned by the district court at all before the jury was impaneled that we had an opportunity to even object. We just went into trial. And Thomas didn't say you had it cautioned, but it didn't hold. And it was raised before the magistrate. Right. Did you want to reserve some rebuttal time, the three minutes? Yes, please. Thank you. Thank you, Ms. Hagan. Good morning. Daniel Mazzabrano from the appellees. The plaintiff appellant, Mr. Wilson, had his day in court. In fact, had four days in court where he was able to present essentially all the evidence he wanted of every alleged negative incident that occurred to him throughout the time he worked for the appellee, Mr. Hanrahan. After hearing all this evidence, a jury unanimously rejected his entire theory of the fault of Mr. Hanrahan's retaliatory or discriminatory enemas. Could you address the argument that your adversary started with, that the district court erred in not submitting the hostile work environment claim to the jury because the jury was not instructed on that theory because it was decided at summary judgment? Yes, Your Honor. I think at the threshold, as we argue in our papers, the appellant's case on summary judgment has no evidence saying anything in support of summary judgment. And so, therefore, we respond to no evidence in our appellee's brief. And this is critical because, as Your Honor pointed out under Section 1983, the critical question is what involvement the employer, the defendant, Mr. Hanrahan, has in these incidents, many of which are anonymous, right? For some of the worst conduct here, it's anonymous vandalism. We don't know whether it was a co-worker, a student in the school. We have no idea who did some of these awful things, right? And so when an appellant seeking summary judgment from this Court does not cite even one iota of evidence of personal involvement of Mr. Hanrahan. Seeking reversal, Your Honor, but let me ask you this. Yes, Your Honor. What the plaintiff comes to us and says is, look, there were four incidents by the employer. How much weight they're given might be debatable, but there were four incidents by the employer, Hanrahan himself. And there are others by other persons that were tolerated by the employer or not adequately corrected by the employer. And the question I have is, on that record, how can we conclude that it's insufficient as a matter of law to allow this hostile work environment to go forward? Well, Your Honor, I think part of it is that a large amount, and in fact, by plaintiff's own account, the by far most egregious incidents, the ones where the perpetrator was known, right, where there was something facially, racially charged about the incident, all of that was subject to settlement agreements, right? And so what we can see to settlement agreements, right, all of that conduct was settled. And so if we look at what happened after the settlement agreements, we have a seventh-month period where there were a couple anonymous incidents. We have what appellant raises for the first time in a reply is a dispute about a letter. But what we do see is that the response from Mr. Hanrahan resulted in a lessening of the severity of any of the incidents that are complained about. This is very different. Is it your position that settlement renders those incidents irrelevant? Or what's your argument? Well, I think that even appellant urges that they should be considered for intent. And so that's exactly what the court did when it came to the trial. That's why all of that evidence came in at trial with respect to discrimination and retaliation. Discrimination and retaliation. But now we're talking about whether or not the employer is possibly liable for a hostile work environment. Right. And I think that the court's focus, when there are settlement agreements, needs to be on what happened post-settlement and whether those incidents are sufficiently severe and pervasive. And what we have post-settlement in this case is we have a couple anonymous incidents, which then stopped as soon as Mr. Hanrahan testified he responded. And then we have, after that, one neutral comment from a co-worker saying, you know, I'm going to get you or something like that. And then we have at the time of termination, Mr. Hanrahan making a comment about a bug infestation. And that's it. That's it, Your Honor. The incidents are before the settlement, right? Yes. Yes. There are other. He's arguing there was a or he's arguing that there was a hostile environment throughout the period. We don't have the terms of the settlement before us. No, we do, Your Honor. We do. I'm sorry. Did I miss that? Well, yes. We had to put in our own appendix because the appellant didn't put that in. So the terms of the settlement provide for? Provide. And actually, let me read you the terms of the settlement. There's two. One is in the – I'm sorry. Bear with me, Your Honor. Because it's important. It's a broad settlement. One example is that the appellant's appendix at page 162 waives any claims arising out of the incidents and ends this dispute for all purposes, but any claims arising out of the incident. So that's why I asked you. Yes. But there was nothing about the settlement that dealt with culpability or anything like that. That's right, Your Honor. So that's why I asked you if your point was that they are irrelevant, that they basically drop out of the case. And I thought you said that that was not what you were arguing. Well, Your Honor, I think it's fair to say that, yes, especially for the purposes of intent, which is what plaintiff argues, one can consider that. But to the extent that there's an allegation of a hostile workplace environment and there have been settlements in place already, I think the focus needs to be, as the district court found, on what happened after the settlements. I think the court also held, alternatively, that even if you look at what happened before the settlements, you cannot, especially under Section 1983, find that there is personal involvement by Mr. Hanrahan that can lead to liability in this case. I'd like to turn briefly to the trial itself. I think on the Batson question, I think it's clear from Thomas that the district court has discretion to find waiver where a magistrate's ruling is not appealed timely to the district court. I think also in the alternative, the magistrate properly weighed the reasons given by counsel. I think it's notable that although there were two African-American jurors who were struck, there was a white juror as well. And in the case here, the appellant argues that, you know, a watching of NCIS is not an appropriate justification. This Court in Farhane found exactly the opposite. And I think in this case, what's important to remember is that Mr. Wilson was terminated for playing basketball when he was supposed to be working and then lying about it. And the only reason that that was known was because there was videotape and there was a dispute before trial about whether it was him on the videotape or not. And so when we have NCIS and you have the police dramas where they, you know, say enhanced video and all of a sudden all the pixels clear up and you can see who it is, that's not how these things work. And so the judge was clearly troubled by the explanation. I think that she was not confident at the outset that that was standing alone, a reason that persuaded her. I think ultimately she, based on all of the evidence, she found the striking to be race neutral because there were other factors, including that the same juror had a mother who was a custodial worker, right, which puts that juror in a, you know, very likely position of bias as to the case as a whole. I think some of the other trial arguments are similarly meritless. The notion that there was any evidence improperly kept from the jury, I think, falls entirely flat. The appellant argues, like many of their arguments for their first time on appeal, argues that the, or suggests that the jury didn't see evidence about the logbook slur, about the chemicals in the sink. All of that went to the jury. If you look at page footnote five of our brief, we go through the record sites for all of the incidents that Mr. Wilson complains about. All of that went to the jury. The jury heard every single piece of pertinent evidence. They considered his theory of the case and they squarely rejected it. Can I just return to the hostile work environment claim again for a moment? Yes. The district court determined that, looking at Mr. Hanrahan's own actions, they were not severe or pervasive enough. It appeared to be applying the Title VII standard, and we're looking at a different one. But I didn't find any place, maybe I missed it, where the district court considered the allegations of undesirable work assignments as part of the hostile work environment. Your Honor, what I think is really important to note on that point is that Mr. Wilson's work assignments were negotiated and settled with him and his union rep, and he signed off on those. So I think that as a matter of law, those cannot provide a legal basis for a hostile work environment claim. Okay. So there's no evidence with regard to those that postdated the settlements? No, there's not, Your Honor. The only evidence on the record, and I think it has to be deemed undisputed, is that those were negotiated by the parties. And so those can't be a basis for a hostile work environment claim. I'll turn briefly to the final issue, which is the question of the Court's granting of a motion to dismiss by the Department of Education. I think that what's important, again, to realize is the narrowness of Appellant's arguments, especially in his opening brief on that point. And what the district court did was it looked at the complaint as pled at the time and said, you have not alleged any basis under which DOE could be found to be an employer. The argument the Appellant urges at pages 15 to 16 of his brief is that that was premature because, as it turns out, the W-2s listed the City of New York. That, of course, could have been pled at the time. It was not. It's certainly no basis to find error in a district court's decision. He then argues, for the first time on reply, a single-employer theory, which, again, finds no basis at all in the actual allegations of the complaint, and therefore this Court should affirm. Why were the W-2s issued with the Department of Education, where the city identified as the employer? Why were they, Your Honor? I assume that that's because the city submits it to the Internal Revenue Service that these are its employees. Why does the city do that if it wants to take the position that, no, they're employees of the independent contractor? So as this Court explained in the Brennan decision and is undisputed here, the city provides, the city engages the employer, Mr. Hanrahan, as sort of a hybrid independent contractor-slash-civil servant. And he is given a lump sum of money to do whatever he wants with. There's a cap on how much he can pay himself, but everything else is up to him. And so under every test for who an employer is, the — I understand your argument. Yes. Yes. About that. But then why are you identifying yourself to the Internal Revenue Service as the employer? I would think you would wash your hands of it altogether. I think, Your Honor, that it's simply for administrative ease for the custodian and engineers who, I think, as we can infer, if they don't have e-mail, they're also not running a payroll database. So that one aspect of how this is done is assisted by the city. That doesn't make sense. If the withholding is not being done correctly, it's not the city that's responsible. It's independent contractors. But the way you're doing this, the Internal Revenue Service, if it identifies a flaw in the withholding, will come to the city. Why are you in this at all? I don't know, Your Honor, but what I do know is that the law from this Court is 100 percent clear that tax treatment is not in any way a dispositive factor. I understand that. But I cannot answer you. I'm just trying to understand why we even have this issue, because the only reason there's a colorable claim here or any kind of a claim is because you are identifying yourselves as the employer to the Internal Revenue Service. I think that the fact of the matter is that you're right. The only argument on appeal, especially looking at the opening brief, is that the district court erred in granting a motion to dismiss because of the W-2s, even though the plaintiff clearly could have alleged that in his complaint and did not. Right. So that provides no basis whatsoever for reversing or vacating a grant of a motion to dismiss where a fact known to the plaintiff was not alleged. It was not presented on reconsideration below. It was never presented timely or properly to the district court. Thank you. I'd like to address several of, I guess, Appellee's arguments. Firstly, I would argue that Appellee's are wrong as far as their position as to whether or not Appellant established Hammerhand's personal involvement. There were altercations that he physically had with Mr. Wilson as far as one incident where he had to be physically restrained by Mr. Wilson's colleagues, where he cursed him out. There was another incident where he cursed out my client again with a racially tinged comment about, you know how you people like to play basketball. And the district court ignored the affidavits of the student and the teacher who witnessed it. It's Appellant's position that there were, I guess, incidents of, I guess, arguments and also adverse employment actions that took place from the time that he made the complaint of discrimination in March of 2010 to when he was terminated in June of 2011. The agreement that was executed by Appellant and, I guess, at the grievance hearing took place in December 16th, 2010. And what the city's position would be is that any incident that predated that, so the incidents that took place between March of 2010 and December of 2010 would not be considered. That is the city's position. But in that instance, and the incidents that they would basically eliminate in those instances would be the altercation that Mr. Hammerhand had in front of the student and the teacher. That would be in April. There was an incident where Mr. Wilson was shoved by his employee. That took place in April. He was terminated in April at that time. That was the first time he was terminated. He was terminated again in June of 2010 after he had been harassed and pushed again and intimidated by his coworker. Then he filed an EEO complaint, EEOC complaint in July of 2010. That would be disregarded. Then there were the unfair work assignments, which is what Appellee referred to and said that he stipulated. There was a question as to whether or not he stipulated to the work assignments in the December 22nd stipulation agreement. It's Appellant's position that he did not, that there at some point there was not an agreement, according to Appellant, as to what he was actually required to do. Appellant testified that he was assigned to clean all the bathrooms in the school, and that he was assigned to clean the stairwells. There's a disputed question of fact as to whether or not that was actually true. Appellant testified that there were 40 bathrooms, for example, in the school and that these were probably the worst parts of the school to clean and that the stairwells were so big in the school that they were particularly burdensome. So there's a question as to whether or not, and Hanrahan played a role in all those things. He assigned the work assignments. He played a role as far as failing to investigate the complaints. At one point he told Appellant, you know, when he complained to him, you know where to take it. So there's a question as to whether, Appellant believes that he has established personal involvement, either through direct altercations that he had with Mr. Hanrahan and or when he reported incidents of discrimination to Mr. Hanrahan, and Mr. Hanrahan told him, you know where to take it, or he was basically cavalier as to whether or not he was going to deal with it anyway. And that it's proper for this Court to consider the pre-settlement evidence as well, if you have evidence postdating the settlements that would go to a hostile work environment. Yes. That's Appellant's position. As far as the videotape and whether or not the jury should have been, the juror should have actually been eliminated based on that, I think Magistrate Judge, Magistrate Bloom's statement that she really was reluctant to actually, I guess, take Appellant's position is really reflective of whether or not she actually looked at their intent in exercising those preemptory strikes. It is Appellant's argument that the fact that she provided them with additional explanations as to why those jurors should have been excluded, acted in a form, acted in a sense of, in a fashion of abdication, because she's not looking at their intent. They told her that they were excluding these jurors because they looked at, you know, NCIS law and order. They didn't say that, you know, because of the woman being, the woman having a mother who was a custodian, a cleaner. They didn't say that. Judge Bloom did that. But I believe that the judge's role in that instance is to determine the intent of the attorneys, not to provide them with necessarily additional grounds for excluding those jurors. I also wanted to get into the issue of, I guess, whether or not the motion to dismiss addressed the issue of the employer. I mean, should the Title VII aspect of the complaint been dismissed because of whether or not DOE, should DOE have been dismissed as an employer? I'm sorry. I'm getting my job. I think it's addressed that in one or two sentences. Yes. And we have a very lengthy calendar. I'm sorry. I'm sorry about that. Firstly, there, and the appellant argued in his brief that there is centralization of the labor and employment, the labor and employment aspect or labor relations aspect. There is centralization as far as the EEO, handling the EEO complaints. So it wasn't just, the appellant didn't, I mean, the appellee, Mr. Hanrahan, did not conduct an EEO investigation. DOE did. Again, you also had the centralization of not just the SCI investigation. Again, Mr. Hanrahan terminated Mr. Wilson, but then he also had to get some kind of, I guess, agreement from the DOE and the special, the SCI unit, the investigation union, to basically make an ultimate determination that Mr. Wilson would not be allowed to work again in any other school. So, again, there's a question as to whether or not the two should be considered a single employee, a single employer for purposes of liability. Thank you both, and we will take the matter under advisement.